UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.           )<br>            ) Crim. No. S 97-cr-40009-NMG<br>ENRICO PONZO,        )<br>            )<br>      Defendant.     ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

In accordance with this Court's Amended Procedural Order Re: Sentencing Hearing (In the light of U.S. v. Booker) (Docket 1890), the government respectfully submits this memorandum with regard to the sentencing of defendant Enrico Ponzo, which is scheduled for April 23, 2014.

The government also is submitting, under seal, an Affirmation of Assistant United States Attorney Michael L. Tabak with additional pertinent information that must be sealed due to Fed.R.Crim.P. 6(e).

Departures

The government will not move for a departure from the applicable guideline range in this case as has been calculated by the Probation Office, which is 420 months (35 years) to life imprisonment plus 60 months. The government concurs with the Probation Office that no factors have been identified that would warrant a departure from this applicable sentencing guideline range.

Non Guideline Sentence

The government will not move for a non guideline sentence in this case, and believes that no factors in this case warrant a variance from the sentencing guideline range as calculated by the Probation Office.

<u>Legal Questions Not Adequately Addressed in the Presentence Report</u>

The government believes that the Presentence Report has adequately addressed the legal issues discussed therein.

<u>Factual Issues Requiring an Evidentiary Hearing</u>

The government believes there are no factual issues that require an evidentiary hearing.[1]

SENTENCING RECOMMENDATION

The government recommends that defendant Ponzo receive a prison sentence of 480 months (40 years), which is (a) within his Guidelines Sentencing Range; (b) appropriate in light of the 420 month sentence that Ponzo's codefendant Vincent Marino, a/k/a Gigi Portalla, received in this case -- which was affirmed by the First Circuit in *United States v. Marino*, 277 F.3d 11 (1st Cir. 2002) -- and the substantial additional criminal conduct that Ponzo committed by, and after, unlawfully fleeing from Massachusetts; (c) exacerbated by Ponzo's failure to rehabilitate himself over the past 20 years, and his demonstrated contempt for the criminal justice system; and (d) additionally warranted by the danger he still poses to particular individuals and the community.

---

[1] In response to Ponzo's Objection 25, the Probation Officer inserted into PSR ¶ 72 Ponzo's assertion that he lived with Cara Pace in Utah. Ponzo has provided no credible support for that contention, which the government believes is false. Ponzo has not provided any W-2 forms, tax returns, paid bills, cancelled checks, submissions from co-workers or neighbors, or any other credible evidence that he lived with Ms. Pace in Utah. To the contrary, Ms. Pace has strenuously denied that she lived with Ponzo in Utah, and the government believes Ms. Pace. Notably, Ms. Pace testified at trial and the jury necessarily believed her testimony when it found Ponzo guilty, among other things, of Count 18 (witness tampering), and the Court was able to observe Ms. Pace's demeanor and testimony. The Court does not need to resolve this discrepancy about Ponzo and Ms. Pace living together in Utah because it is irrelevant to Ponzo's sentencing, but the government submits that it is one more example (of many) of Ponzo out-and-out lying to the Court and attempting to manipulate the judicial system (including the Utah state court) to his benefit.

The government also recommends 3 years' supervised release, forfeiture as requested in the United States' Motion for Preliminary Order of Forfeiture (Specific Assets) (Docket 2017) and the United States' Motion for Order of Forfeiture (Money Judgment) (Docket 2016), and the required special assessment of $900. The government is not seeking restitution[2] or a criminal fine.[3]

## The Guidelines Sentencing Range

The Probation Office has appropriately concluded that Ponzo's Guidelines Sentencing Range is between (a) 420 months' imprisonment and (b) life imprisonment plus 60 additional months' imprisonment.[4] As set forth in the Presentence Report, Ponzo's total offense level is 40, and his

---

[2] The government is not seeking restitution for Fedele DelBene, the victim of an extortionate collection of which Ponzo was found guilty, because when DelBene testified at Ponzo's trial -- approximately 20 years after the crime occurred -- DelBene could not remember how much of the $25,000 that he gave to Ponzo was repayment of principal that DelBene had actually borrowed from loanshark James Tortorici. Therefore, the government would not be able to satisfy its burden under 18 U.S.C. § 3664(e) of proving the amount of restitution due.

[3] A criminal fine within the applicable Guidelines range of $25,000 to $7.5 million could be appropriate under 18 U.S.C. § 3572(a), U.S.S.G. § 5E1.2(d), and PSR ¶ 238, and permissible as in *United States v. Lujan*, 324 F.3d 27, 35 (1st Cir. 2003), since Ponzo may well have cash hoards in addition to the one found hidden under the floor in his house in Idaho. However, in view of the substantial prison sentence that the government anticipates that Ponzo will receive (which may prevent him from accessing such a hoard or benefitting from having anyone else doing so at his direction) and the magnitude of the forfeiture that the government anticipates will be ordered in this case, the government has concluded that no useful purpose would be served in seeking, engaging in litigation (likely including appellate litigation) about, or attempting to locate hidden assets for, a fine.

[4] The government, the Probation Office, this Court, and the First Circuit agreed that the base offense level for the RICO count as to Vincent Marino was 43. The government is not advocating for that base offense level as to Ponzo because the jury in Ponzo's trial found that the government had not proved that the Devlin murder and the Souza murder were acts that Ponzo agreed that he or someone else would commit as part of the racketeering conspiracy, and because the First Circuit relied upon certain corroborative facts as to Marino that do not apply to Ponzo.

criminal history category is VI,[5] yielding a GSR of 360 months to life, to which a *consecutive* sentence of 60 months must be added to *both* the low end and the high end due to Ponzo's conviction in Count 3 of violating 18 U.S.C. § 924(c), so that the Guidelines Sentencing Range effectively is (a) 420 months (*i.e.*, 360 months plus 60 months) to (b) life imprisonment plus 60 months.

Ponzo's extensive complaints about the Guidelines calculations are mistaken as set forth in the final Presentence Report. The Probation Office correctly used the 2013 Sentencing Guidelines Manual,[6] but even if the 1994 Guidelines Manual -- the one potentially most favorable to Ponzo --

---

[5]   Ponzo claims (Objection 42, PSR page 75) that his 1989 conviction for unlawful possession of a silencer should not be counted because Application Note 1 to U.S.S.G. § 4B1.2 did not explicitly say that unlawful possession of a silencer is a "crime of violence" until 2004. However, six years *before* that Guidelines amendment, the First Circuit had held that unlawful possession of a silencer was a crime of violence within the meaning of § 4B1.2. *United States v. Fortes*, 141 F.3d 1, 7 (1st Cir. 1998), which cited earlier cases from the Ninth Circuit that had made the same holding. Ponzo claims ("True Submission" at 9) that he entered a guilty plea in 1989 "without his Attorney present." Ponzo has not offered a transcript, an affidavit from the attorney, or anything else to support this assertion.

[6]   Ponzo cites the Supreme Court's June 10, 2013 decision in *Peugh v. United States*, 133 S.Ct. 2072 (2013), but on November 22, 2013 the First Circuit held in *United States v. Pagan-Ferrer*, 726 F.3d 573, 595-99 (1st Cir. 2013) -- after discussing *Peugh* -- that "the one book rule [of U.S.S.G. § 1B1.11(b)(2)] does not violate the Ex Post Facto Clause as applied to a series of grouped offenses ...[,] [a] decision [that] is ... consistent with the findings of an overwhelming majority of our sister circuits." *Id.* at 598 (citations omitted). In Ponzo's Presentence Report, Count Group 3 encompasses related drug and money laundering conduct running from 1989 through 2001. Count Group 7 covers witness tampering committed from 2011 to 2013 that is directly related to Count Group 3 because a major object of Ponzo's witness tampering was to distance himself from the guns and ammunition that he had purchased with marijuana proceeds and that therefore linked him to the marijuana trafficking and independently constituted money laundering. Since the rationale of *Pagan-Ferrer* is based on whether the offenses are "closely related," *id.* at 599, it applies to Ponzo, whose closely related offenses in Groups 3 and 7 run from 1989 through 2013, confirming the Probation Office's determination that it is appropriate to use the 2013 Manual. Notably, the First Circuit affirmed in *Pagan-Ferrer* the decision of the Probation Office and the District Court to group into one group (a) the defendant's crimes in 2003 of violating a victim's civil rights and causing his death, and (b) the defendant's crimes in 2008 of making false statements and obstructing justice, *id.*, at 595, and the First Circuit held that the Guidelines Manual in 2003 had put the defendant "on notice that if he committed a closely related offense in the future, his sentence for both offenses

were used, Ponzo's Guidelines Sentencing Range would still be 420 months to life imprisonment plus 60 months.[7]

Consideration of the Factors Listed in 18 U.S.C. § 3553(a)

Under 18 U.S.C. § 3553(a), the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)(2), after considering the factors set forth in § 3553(a)(1) through § 3553(a)(7).

Nature and circumstances of the offenses. Ponzo has been convicted of an extensive array of serious offenses that span more than 20 years, including a racketeering conspiracy that included

---

would be calculated pursuant to the Guidelines in effect at the time of that later, related offense conduct" but that "he nevertheless elected proceed with the commission of the obstruction offenses that would trigger the application of the revised Guidelines. Accordingly, the change in [the defendant's] offense level is properly viewed not as a consequence of an ex post facto violation, but as the direct result of his decision to engage in closely related offense conduct in 2008." *Id*. at 599 (citation omitted). The same reasoning applies to Ponzo.

[7] It would be an administrative nightmare to compute offense levels, criminal history category, and grouping, and to factor in all of the other intricacies of the Sentencing Guidelines and Application Notes if -- as Ponzo insists (Objection 5) -- eight (8) different Guidelines Manuals had to be considered in Ponzo's case alone. That is why there is a one book rule, which has been repeatedly upheld by the overwhelming majority of circuits, including the First Circuit, against Ex Post Facto challenges, as detailed in the First Circuit's post-*Peugh* decision in *Pagan-Ferrer*, 736 F.3d at 598. As reflected in Count Group 3, Ponzo's drug crimes with RICO co-conspirators encompassed not only the period from 1989 to 1994 but also -- again involving RICO co-conspirators such as John Mele and Vincent Marino -- from the time Ponzo fled prosecution in Boston in 1994 until at least March 1999 when he left Arizona. Under the 1998 Manual (which was in effect during March 1999), Ponzo would wind up with the same Guidelines Sentencing Range of 420 months to life imprisonment plus 60 months as under the 2013 Manual. But even if the 1994 Manual were used -- which would not be warranted -- Ponzo's Guidelines Sentencing Range would be the same, because (a) the base offense level for Count Group 1 would be 28 (rather than 33 in the later books), plus 4 levels for permanent or life threatening injury = 32; (b) similarly, it would be 32 for Count Group 2; (c) the base offense level for Count Group 3 would be 32, plus 3 levels for being a manager = 35; (d) there would be 3 grouping units resulting in a combined adjusted offense level of 38, which at Criminal History Category VI would leave Ponzo with the identical Guidelines Sentencing Range of 420 months to life imprisonment plus 60 months.

a conspiracy to murder Francis Salemme, Sr., Mark Rossetti, Stephen Rossetti, Ralph Rossetti, Richard Devlin, Richard Gillis, Joseph Souza, Michael Prochilo, Sr., Joseph Cirame, Timothy Lawrence (Larry) O'Toole, Jr., Robert Luisi Jr., and Lonnie Hilson; the attempted murder of Salemme; assault with intent to murder Salemme; the attempted murder of Cirame; assault with intent to murder Cirame; conspiracy to distribute cocaine; interstate travel in aid of racketeering (extortion) activity; conspiracy to use extortionate means to collect one or more debts; use of extortionate means to collect a debt (from Fedele DelBene); and collection of unlawful debt (Count 1); conspiracy to murder those people in consideration for money from the racketeering enterprise or for the purpose of gaining entrance to or maintaining or increasing position in the New England La Cosa Nostra (NELCN) (Count 2); use or carrying of firearms during and in relation to the murder conspiracy in aid of racketeering (Count 3); conspiracy to distribute cocaine (Count 6), as to which the jury found in its special verdict that at least 500 grams of cocaine were involved; conspiracy to use extortionate means to collect one or more debts (Count 9); use of extortionate means to collect a debt (from Fedele DelBene) (Count 10); unlawful flight to avoid prosecution (Count 13); conspiracy to distribute marijuana (Count 14), as to which the jury found in its special verdict that at least 1,000 kilograms (more than a ton) of marijuana were involved; conspiracy to launder money from narcotics trafficking with intent to promote narcotics trafficking (Count 15); money laundering by buying property and building house at 6107 Hogg Road, Marsing, Idaho, using proceeds from narcotics trafficking, to conceal that the funds were proceeds of narcotics trafficking (Count 16); money laundering by buying $65,00 worth of gold coins, using proceeds from narcotics trafficking, to conceal that the funds were proceeds of narcotics trafficking (Count 17); and attempt to tamper with a witness (Cara Pace) (Count 18).

It is important to emphasize that the above list includes only the Counts and the specific racketeering acts that the jury, in its special verdict, unanimously and explicitly found to have been proven beyond a reasonable doubt (even though the law does not require such a restrictive approach at sentencing). Each of those proven crimes and racketeering acts is serious in its own right.

Those crimes began no later than 1989, and Ponzo's criminal conduct extended not only through his witness tampering in this very case but even to this very day, as Ponzo knowingly and willfully makes materially false statements and representations to this Court. *See* 18 U.S.C. § 1001.

When Ponzo was one of the shooters in the June 16, 1989 attempted murder of Frank Salemme, Ponzo was 20 years old. Although Ponzo refuses to accept responsibility for his participation in that murder conspiracy and shooting, he argues that if he had played a role, it would have resulted from coercion, duress, entrapment, self-defense, or as a result of outrageous government misconduct.

In particular, in his so-called "Defendant's True Factual Submission in Opposition to Government's False Version," Ponzo contends (at 2 and 9) that he is entitled to a downward departure under U.S.S.G. § 5K2.13 ("Coercion and Duress"), but his argument is incoherent. It is the defendant's burden to establish by the preponderance of the evidence the applicability of a ground for downward departure, *United States v. Sachdev*, 279 F.3d 25, 28 (1st Cir. 2002), which means that Ponzo would have to show that he "*committed the offense* because of serious coercion ... or duress." U.S.S.G. § 5K2.13 (emphasis added). *See*, *United States v. Cotto*, 347 F.3d 441, 446 (2d Cir. 2003). It is logically impossible for Ponzo to show that he committed the offense (such as the attempted murder of Salemme) *because* of serious coercion or duress, given that Ponzo emphatically denies that he committed the offense at all.

Even if Ponzo had admitted that he attempted to murder Salemme, Ponzo's claim of serious coercion or duress would fail since Ponzo has failed to offer any credible evidence to sustain his burden of proving that Ponzo acted, on June 16, 1989, under serious coercion or duress. Ponzo has provided no evidence of why someone in Salemme's position would have had any idea who the 20-year-old Ponzo was in 1989 and why Ponzo -- who denies any participation in the RICO conspiracy -- would have been subjected in 1989 to coercion or duress by Salemme or anybody else.[8]

Ponzo has not accepted responsibility for his crimes[9] or provided any credible mitigating factors with regard to his crimes. To the contrary, every crime and racketeering act of which Ponzo

---

[8] Similarly, Ponzo claims entrapment and outrageous government misconduct, but furnishes no credible evidence and, more fundamentally, does not admit that he committed any crimes, so Ponzo's contentions do not merit further discussion.

[9] The Probation Office has correctly rejected Ponzo's suggestion that he should receive credit for acceptance of responsibility under U.S.S.G. § 3E1.1. It is the defendant's burden to prove that he has clearly demonstrated acceptance of responsibility for his offense, *United States v. Baltas*, 236 F.3d 27, 37 (1st Cir. 2001), and Ponzo has utterly failed to meet his burden. "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id*. Moreover, "[this] two-level reduction is for contrition," *United States v. Ortiz-Torres*, 449 F.3d 61, 76 (1st Cir. 2006), and requires that the defendant demonstrate "candor and authentic remorse." *United States v. Hardy*, 99 F.3d 1242, 1246 (1st Cir. 1996). But, Ponzo has done nothing of the kind. He has had 5 months since the jury verdict to reflect on it, but still refuses to admit his guilt of the serious crimes of which he has been convicted. To the contrary, Ponzo has failed to demonstrate any remorse for any of his criminal behavior, and indeed, he still contends that he is not guilty of most of the conduct for which he was convicted at trial. The only crime he seems to admit that he committed was the marijuana trafficking, and even there he contests the true nature of his offense conduct, claiming to have been a minor participant in the operation. As the Probation Office correctly noted, Ponzo ran the Arizona side of the operation. He negotiated price and amount with Jesus Quintero, one of the sources of supply; employed David Rudolph to package and ship the marijuana; and employed Alfred Martochio (the Federal Express driver) to ensure that shipments reached Boston unmolested. Ponzo was responsible for paying Quintero for the marijuana the operation purchased; received the payment from Boston after the marijuana was sold; and paid the Arizona workers (including Rudolph and Martochio). Ponzo's false denials and frivolous contesting of relevant conduct evidences his wholesale failure to accept responsibility for his criminal behavior. *See* U.S.S.G. § 3E1.1, Application Note 1(A).

has been found guilty was an affirmative act that Ponzo chose to commit out of a quest for power, money, higher status as a criminal, or in a cowardly attempt to escape responsibility and just punishment for his crimes.

History and characteristics of the defendant. Ponzo's father was a long-time and apparently valued employee of the United States Postal Service.[10] Ponzo's mother was gainfully self-employed. Ponzo's only sibling graduated from college, obtained a master's degree, and became a teacher. But, Ponzo decided at a young age to strike out on his own path, committing crime after crime, earning a reputation as violent thug, and choosing to ally himself with Mafia members and associates.

In 1985, when Ponzo was convicted of carrying a firearm (a .32 caliber Iver Johnson revolver from which the serial number had been obliterated) without a license at age 17 (PSR ¶ 160), a state court judge gave Ponzo the option of of serving one year in the House of Correction or enlisting in the Army. (*See* attached records.) Ponzo seized the opportunity to avoid incarceration by enlisting, but instead of treating this as a chance to turn his life around and become a productive citizen, Ponzo proceeded to get himself kicked out of the Army less than six months after joining.

Ponzo asserts that he is innocent of almost all of the charges in the indictment, but that nonetheless he has fully rehabilitated himself -- from what, he never specifies. But, unfortunately, he has not self-rehabilitated. Even though he fled Boston in 1994 and was able for the next 16 years to live, undetected by law enforcement, thousands of miles from Boston, under a series of new identities, he did not take the opportunity to become a productive, law-abiding member of society.

---

[10] Ponzo has provided no support for his scurrilous assertions (PSR ¶ 183) about his father, who was never described in that fashion by any of the many witnesses the government interviewed.

Instead, as Ponzo fled from state prosecution in Massachusetts, he maintained connections with his NELCN confederates and plugged into a major marijuana distribution operation.[11] While conducting those illegal activities in Arizona, Ponzo convinced a girlfriend from Massachusetts to join him in Phoenix, had a child with her in 1996, and then beat her up, after which she and the one-year-old baby returned to the East Coast in 1997, never to be supported thereafter by Ponzo.[12]

In 1999, after having earned and saved hundreds of thousands of dollars from his major role in the large-scale marijuana distribution business, Ponzo and a new girlfriend (Cara Pace) moved from Arizona, eventually winding up in Idaho. Even after that move, however, Ponzo did not cease his criminal activities. Rather, Ponzo engaged in money laundering, using his saved drug proceeds to purchase (among other things) land in Idaho, $65,000 worth of gold coins, more than 20 firearms and more than 30,000 rounds of ammunition -- which Ponzo was well aware violated the felon in possession statute, 18 U.S.C. § 922(g). Even as Ms. Pace had two children by Ponzo, and even though Ponzo had crafted false IDs that were sufficiently believable to allow him to obtain credit cards, he never sought or obtained a lawful job from which he could support the family. Instead,

---

[11] In Objection 36, Ponzo asserts that "no coconspirators were listed by the government pretrial for the marijuana conspiracy." That is false. In its February 22, 2013 discovery letter, the government produced information about David Rudolph, Mark Weddleton, Steven Stoico, Paul Passacantilli, Alfred Martochio, and others. On July 26, 2013, the government produced grand jury testimony of Stoico, Weddleton, Juan Sepulveda, and interview reports of John Mele. On August 13, 2013, the government produced grand jury testimony of Jesus Quintero and Weddleton, and interview reports of Martochio, Piano, Quintero, and Rudolph.

[12] When she first returned to the East Coast, Ponzo's father, Michael Ponzo, gave this woman $800 per month in child support payments from rental income that Michael Ponzo was earning from properties that he owned. However, after approximately four years, Michael Ponzo got into severe financial difficulties and was never able to resume making the payments. *See*, *e.g.*, Trial Transcript at 14-114 - 14-116 (Divadkar); 16-61 - 16-63 (Gestwicki). Enrico Ponzo never used any of his own funds to provide child support payments for this child.

Ponzo enjoyed his time staying at home while having Ms. Pace work full-time to earn a very modest salary. Indeed, Ponzo allowed his family to get by using primarily Ms. Pace's salary despite the fact that he was sitting on approximately $200,000 in drug proceeds.

Ponzo has continued to display contempt for the law and for these proceedings since his apprehension in Idaho. When arrested on February 7, 2011, Ponzo initially lied about his identity. After being arrested, he engaged in a protracted campaign of witness tampering, which continued through the January 31, 2013 date of the superseding indictment.

And, in October 2013, shortly before the trial began, Ponzo quarterbacked a bad-faith opposition to the government's motion to require him to appear clean shaven at trial.[13] Ponzo claimed that shaving his beard would "impose[] a substantial burden on his religious practice [and] actually prohibit[] him from practicing an important aspect of his faith" because "Ponzo identifies as a follower of Judaism" and, according to Ponzo, "the Jewish faith prohibits ... the shaving of hair with a razor." (Dkt. 1744 at 4). Ponzo never explained why he appeared in court every day with his cheeks shaved, but more to the point, Ponzo was not and never has been Jewish. As Ponzo wrote in a Detainee Request Form on January 29, 2014 (copy attached), "I was raised Roman Catholic and went to Catholic school. I am notifying this institution [the Donald W. Wyatt Detention Facility] that I am attending Catholic services because I was raised Catholic and attended Catholic school in Boston. Therefore it is my religious 1st Amendment right to attend services."

---

[13] If the motion had been granted, shaving Ponzo's beard would have exposed his prominent cleft chin to trial witnesses who had known him during the RICO conspiracy, when he was clean shaven. The Court denied the government's motion without prejudice (10/3/13 Final Pretrial Transcript at 4), but the government did not find it necessary to pursue the matter.

Even now, after having had 5 months to reflect on the fact that a jury of his peers unanimously found him guilty, based upon proof beyond a reasonable doubt, of the long list of crimes mentioned above, Ponzo has persisted in personally and repeatedly submitting materially false statements to this Court.

For example, Ponzo's repeated assertion (*e.g.*, Docket 2018) that he cannot clearly hear most conversation unless at close range is demonstrably false. Throughout the judicial proceedings in this case since Ponzo's arrest in 2011, Ponzo has demonstrated time and again that he is able to hear clearly the words being spoken in the courtroom, without using hearing aids. For instance, the transcript of the September 28, 2012 hearing before Chief Magistrate Judge Sorokin includes Ponzo repeatedly answering questions from the Court, reflecting that Ponzo was able to clearly hear and understand the proceedings, despite the fact that the defense table was behind the prosecution table, a substantial distance from the bench. *See* 9/28/12 Tr. at 2, 4-7, 12-24, 26-31, 33 (copy attached). Just a few weeks ago, at the hearing on February 28, 2014 on Ponzo's motion to proceed pro se, Ponzo had no difficulty hearing and responding to questions from this Court.[14] And, during the trial itself, Ponzo spoke up on a number of occasions, reflecting that he clearly heard and understood what was being said, as shown, for example, at trial transcript pages 1-22 - 1-23, 6-7, 7-4, 8-175, 13-78, and 20-25.[15]

---

[14]     Since Ponzo participated in that conference by video link from the Wyatt Detention Facility, it is not surprising if Ponzo was unable to hear a prosecutor who neglected to speak into the microphone on counsel table.

[15]     The Court offered to provide Ponzo with headphones and related equipment for the hearing impaired, which Ponzo elected not to use. Nothing further was required under the circumstances. *See United States v. Crandall*, -- F.3d --, 2014 WL 1386650 (2d Cir. April 10, 2014).

Ponzo says he has known since childhood that he has 50% hearing loss (Docket 2018 at 1), yet Ponzo has seen no need to spend his own money to purchase hearing aids, even though Ponzo easily could have afforded hearing aids, using some of the approximately $200,000 in cash and gold coins that Ponzo had hidden in his house.

Indeed, it is a strong indication of Ponzo's character (or lack thereof) that he has falsely and deliberately besmirched the memory and reputation of his father and his mother -- neither of whom can respond because they are dead -- in order to try to avoid conviction and a substantial prison sentence in this case.[16]

Need for the sentence to reflect the seriousness of the offense. Congress has recognized the seriousness of the types of offenses that Ponzo has committed by creating substantial maximum prison terms for them. The Sentencing Commission has established offense levels for those types of offenses that are appropriate, as are the Career Offender and Criminal History Category status that apply to Ponzo. Ponzo joined a murder conspiracy in which he personally was a shooter and in which several people were killed and others received life-threatening and permanent injuries. The reign of terror imposed on the City of Boston by Ponzo, his confederates, and their enemies during the shooting war impacted the lives of everyone who lived here. Ponzo has also been convicted of large-scale narcotics distribution, extortionate collection, witness tampering. The crimes Ponzo

---

[16] Moreover, Ponzo claims that while he was a fugitive, he was in contact with his mother on a monthly basis before she died in 1997 and his father before he died in 2007 (PSR ¶¶ 185, 186), but even if that were true -- which is highly unlikely -- Ponzo did not see fit to jeopardize his own situation by visiting or helping either of them in any way as they were dying, or paying final respects at or before their wakes and funerals. Notably, Ponzo was arrested on February 7, 2011 and called Cara Pace from the Ada County (Idaho) Jail at 8:01 p.m. that evening. During that call, Ponzo said, "I need money to -- I need to contact my dad" (see attached transcript) -- reflecting the Ponzo did not know that his father had died years earlier, and refuting his claim to have been in monthly contact with him.

perpetrated are some of the most serious offenses on the books. His actions evidenced a callous disregard for the lives and safety of others and merit a very substantial prison sentence.

Need for the sentence to promote respect for the law. Not only did Ponzo abscond to avoid prosecution and remain a fugitive for more than 16 years, but in the more than 3 years since his February 7, 2011 arrest, as discussed above, he has displayed his disrespect for the judicial system and the law by his prevarications and witness tampering. A substantial sentence is necessary to promote respect for the law.

Need for the sentence to provide just punishment for the offense. Ponzo's criminal conduct seriously affected the lives of the victims of the shooting spree in which he and his co-conspirators engaged; the extortionate collection; the drug dealing and distribution; and the other crimes of which he has been convicted. A substantial sentence is necessary to provide just punishment.

Need for the sentence to afford adequate deterrence to criminal conduct. All of Ponzo's criminal conduct was premeditated and due to greed for status, power, and money. Just as these things apparently lured him, at a young age, into his life of crime, so to could the example that he set lure other young people to throw their lives away. Sentences that minimize the significance of habitual criminal behavior undermine respect for the law, and encourage younger offenders to believe that they can break the law with impunity. A substantial sentence is necessary to deter others from engaging in such crimes.

Need for the sentence to protect the public from further crimes of the defendant. As set forth above, Ponzo unfortunately has not reformed himself and continues right up to the present (and likely during the sentencing hearing) to commit further crimes. He has been a vicious, violent, cold-blooded criminal who has violently victimized even people who attempted to be close to him.

Rather than admit his obvious guilt after a seven-week trial in which he was found guilty of the numerous crimes set forth above, Ponzo contends that the witnesses were liars and that he was framed. There is every reason to fear that Ponzo -- who was able to create false identities, hide from the authorities for more than 16 years, and illegally acquire large caches of firearms and ammunition -- would pose a serious danger to the many witnesses who testified in this case if Ponzo were to be released while he is still physically capable of inflicting harm. Indeed, Ponzo engaged in his witness tampering activities while detained in federal custody.

Whatever opinion one may hold about the relative worth of mandatory minimum sentencing (which does not apply in this case as Ponzo is not being sentenced to a mandatory minimum term), it is also the case that some people simply will not abide by the rules of society. Ponzo has demonstrated that no matter what opportunities are presented to him, he *will* re-offend again. A substantial sentence is necessary to protect the public from further crimes by Ponzo.

<u>The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct</u>. In this very case, two of Ponzo's codefendants were previously convicted after trial in 1999. Vincent Marino, a/k/a "Gigi Portalla", received a prison sentence of 35 years (420 months), and John Patti, III received a prison sentence of 30 years (360 months), based upon their participation in the drug trafficking and shooting war of the NELCN.[17] Ponzo's crimes warrant a significantly longer prison sentence than Marino and Patti received in this case for a number of reasons including, among others, the following:

- ♦ Ponzo was charged with, and found guilty of, more serious conduct;

---

[17] Patti's sentence was reduced after he provided substantial assistance including truthful, significant testimony in a state murder trial.

- Ponzo's criminal behavior extended over a much longer period of time;

- Ponzo was a fugitive for more than 16 years;

- Ponzo has personally, repeatedly, and flagrantly violated orders of this Court and knowingly made material false statements to this Court and attempted to corrupt the judicial process by engaging in witness tampering.

Unlike so many defendants who lack language or work skills, fight debilitating addictions, and/or have no support network to fall back on, defendant Ponzo came from a loving and supportive home and has demonstrated the knowledge, dedication, and ability to run a large-scale drug trafficking operation. These same skills could have been put to use in legitimate employment, and Ponzo could have become, if he had chosen to, a useful and productive member of society. Instead, he engaged in a criminal livelihood and sought to manipulate the system at every turn. To put it bluntly, he has had every opportunity to succeed legitimately, and he just does not have any excuse for his persistent criminal behavior.

In view of the criminal conduct of which Ponzo has been found guilty, his background and character, his continuing denial of responsibility and lack of remorse, and the sentences that his co-defendants received in this case, the government's sentencing recommendation is reasonable.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: */s/ Michael L. Tabak*
Michael L. Tabak
Karen D. Beausey
Dustin Chao
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

    I hereby certify that this document has been served by e-mail to (a) Jean Singleton, Programs Manager at the Donald W. Wyatt Detention Center, 950 High Street, Central Falls, RI 02863, for hand delivery to defendant Ponzo, and (b) standby counsel John H. Cunha, Jr..

                                                */s/ Michael L. Tabak*
                                                Michael L. Tabak
                                                Assistant U.S. Attorney

Date: April 18, 2014