UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>ENRICO PONZO,<br>    Defendant pro se. | Case No. S-97-cr-40009-NMG |

## DEFENDANT PONZO'S PRO SE SENTENCING MEMORANDUM

### I. INTRODUCTION

**NOW COMES** Enrico Ponzo, defendant pro se, (hereinafter "Ponzo")
submits the instant sentencing memorandum with consideration of
18 U.S.C. Sec. 3553(a) and mitigating factors. On April 2, 2014
Ponzo timely filed with Probation, "Defendant Ponzo's Objections
to the March 19, 2014 Draft Presentence Investigation Report",
(hereinafter "Objections to PSR") (attached as Exhibit 1), that
document and all other submissions to Special Probation Officer
Jennifer Broquist shall be incorporated by reference as if fully
set herein as part of this sentencing memorandum.


### II. FACTS REGARDING THE INSTANT OFFENSE

In early 1989 the then 20 year old Ponzo was arrested for items
(firearms, silencer, inositol, grinder, etc.) that were stored in
the Ponzo family home by Cooperating Witness John Mele,and his drug
partner Robert Paleo, Jr.,who then setup Ponzo for arrest to lessen
their culpability on serious pending charges. At the time Ponzo was
a habitual user of cocaine, since then Ponzo has been strongly opposed
to the distribution and consumption of cocaine. In addition,
Confidential Informant Robert Paleo, Jr. informed on Charles Street
Jail Guard,Paul Corbosiero and Codefendant Vincent Marino to MSP

page 1 of 36

Sergeant Trooper William McGreal, concerning his straw purchases of several firearms resulting in Search Warrants to Marino's residence in the spring of 1989.(MSP McGreal   testified to these facts in other proceedings). Then on June 26, 1989 Ponzo was arrested for an Assault & Battery with a Dangerous Weapon that was actually committed by CI/CW Charles McConnell who was arrested,prior to Ponzo,in the vehicle CW McConnell used to commit the ABDW. Ponzo ended up serving appx. 14 months in the Billerica House of Correction for those arrests, that are definitely part of the instant offense (USSG 4A1.2(a)(1). After Ponzo's release from Billerica H.O.C.he visited CW John Mele and CI Robert Paleo, Jr. while they were imprisoned in the Mass. Dept. of  Corrections at Norfolk and Plymouth Foresty Camp.

In the Summer of 1994 Ponzo was framed by the Boston and Everett Police Departments for crimes he was factually and legally innocent of. In fact, the Suffolk Superior Indictment, SUCR 1994-11353, was nolle prosequi and dismissed on March 6, 2014. The Malden District Court case, Docket No. 9450cr3760, charging Ponzo with Assault with Intent to Murder, the alleged victim testified at Ponzo's Codefendant Domenic Strazzulla's trial that he could not identify his assailant, See Middlesex Superior trial Transcripts Case No. 95-695-1-3 in Exhibit No. 1   . Nevertheless, after Ponzo's close friend Michael Romano, Jr. was murdered on Sept. 1, 1994 Ponzo went on the run for his life due to several attempts to murder him and his good friend CW Joseph Cirame,who was shot several times on Sept. 16, 1994. At first Ponzo lived in Lowell, MA with his girlfriend at the time CW Gestwicki. Then on March 20, 1994 due to CI/CW John Mele's command Ponzo moved to Arizona where he was minimally involved in

in      the alleged packing and shipping of marijuana at the direction
of CW John Mele until mid 1997. Those events are described in depth
herein. On April 4, 1997 Ponzo, who was allready on the run for
his life, was indicted with 14 others in this matter on the RICO
counts and the other Mass. Charges that became Cts. 1 through 12,
spanning the years 1989 through 1994,in the January 31, 2013
Superseding Indictment. On Jan. 31, 2013 Ponzo was charged in the
Superseding Indictment on the Arizona and Idaho charges,spanning the
years 1994 through 2013, that became Counts 13 through 18. On Nov.
20, 2013,after a seven week trial, Ponzo was convicted of twelve
counts as described in the PSR paras. One through Eight.

Probation's determination of the Sentencing Guidelines places
Ponzo in a erroneous guideline range of 360-Life based on the
offense level of 40    , Criminal History Category  VI  , due to
Probation's erroneous suggestion that Ponzo is a Career Offender
under a post offense 2013 USSG Sec. 4B1.1 et seq. However,neither
the PSR's proposed guidelines range nor the Career Offender
designation applies herein, and the proper guideline range is
 123 - 138    months based on an Total Offense Level of 26 plus 60 months
and a Criminal History Catergory of  I   based on the Jury's
verdict, See Alleyne hereafter. (Objections to PSR paras. 37-47
Exhibit 1). On Nov. 20, 2013  Ponzo was convicted by the Jury
in Counts 6(4) and 14(11) of 21 U.S.C. Sec. 846, 21 U.S.C. Sec.
841 (b)(1)(A) & (B) that currently carry 10 and 5 year mandatory
minimums but will soon become 5 and 2 year mandatory minimums with
the enactment of the Smarter Sentencing Act of 2013, S.1410,("SSA")
that should apply herein forthwith. In addition, regarding those
counts the January 17, 2013 Proposed Amendments to the Sentencing

Guidelines were voted in unanimously on April 10, 2014 by the U.S. Sentencing Commission as reported in the USA Today on Friday, April 11, 2014, See Exhibit No. 2). Ponzo was also convicted of Count 2s , 18 U.S.C. 1959(a)(5)that carries a maximum penalty of ten years, and the consecutive five year mandatory penalty in Count 3s, the 1994 version of 18 U.S.C. 924(c), that Ponzo objects to the application of Count 3s due to the fact the Jury was erroneously instructed with "possession" a new element in the ex post facto 1998 version of 18 U.S.C. 924(c), See Docket No. 2010.

For all the reasons explained and put forth herein, the appropiate sentence that should be given Ponzo with facts found by the Jury on Nov. 20, 2013,concerning the Nov. 14, 2013 Amended Superseding Indictment,is under 15 years, pursuant to Alleyne v. United States, 133 S.Ct. 2151 (2013).


## III. SENTENCING FACTORS

A. The foregoing Supreme Court Decisions are particularly relevant to Ponzo's sentencing and should be applied thereto:

Alleyne v. United States, 133 S. Ct. 2151, 2162 (2013), "When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to a jury."

Peugh v. United States, 186 L. Ed. 2d 84, 93 (2013), "There is a ex post facto violation when a defendant is sentenced under guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable guidelines sentencing range than the version at the time of the offense....at 103, District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described. The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for deviating from the older guidelines

a status that is simply not equivalent for ex post facto purposes."

Gall v. United States, 552 U.S. 38, 56-57(2007),"the critical relevance of Gall's voluntary withdrawal, a circumstance that distinguished his conduct not only from that of all of his codefendants, but from the vast majority *57 of defendant's convicted of conspiracy in federal court. The District Court quite reasonably attached great weight to the fact that Gall voluntarily withdrew from the conspiracy after deciding on his own initiative, to change his life. This lends strong support to the District Court's conclusion that Gall is not going to return to criminal behaviour and is not a danger to society, See 18 U.S.C. Sec. 3553(a)(2)(B),(c). Compared to a case where the offender's rehabilitation occured after he was charged with a crime, the District Court here had greater justification for believing Gall's turnaround was genuine, as distinct from a transparent attempt to build a mitigation case."

Pepper v. United States, 131 S.Ct. 1229,1242 (2011),"Post-sentencing rehabilitation  may be highly relevant to several of the Sec. 3553(a) factors Congress has expressly instucted District Courts to consider at Sentencing. For example, evidence of post-sentencing rehabilitation may plainly be relevant to"the history and characteristics of the defendant." Sec. 3553(a)(1). Such evidence may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in Sec. 3553(a)(2)--in particular, to "afford adequate  deterrence from criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educa-tional or vocational training... or other correctional treatment in the most effective manner," Secs. 3553(a)(2)(B)-(D); see McMannus, 496 F.3d at 853 (Melloy, J. Concurring) ("In assesing... deterrence, protection of the public, and rehabilitation, 18 U.S C. Sec. 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post-incarceration conduct"). Post-sentencing rehabilitation may also critically inform a sentencing judge's overarching duty under Sec. 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth inSec. 3553(a)(2)."

Descamps v. United States, 133 S.Ct. 2276, 2283-4 (2013),"if the statute sweeps more broadly than the generic crime,a conviction under that law can not count as an ACCA predicate (or Career Offender) even if the defendant actually committed the offense in its generic form,...at 2293 A court may use the modified approach only to determine which alternate element in a divisable statute formed the basis of the defendant's conviction."

B. 18 U.S.C. Sec. 3553(a) factors

In United States v. Booker, 544 U.S. 220 (2005), The Supreme

Court found that the mandatory nature of the Federal Sentencing

Guidelines violated the Sixth Amendment's right to a jury trial.
The Court severed those mandatory provisions, rendering the
Sentencing Guydeline's "effectively advisory." Id. at 245.
Consequently, district courts must impose a sentence in accordance
with all of the stated sentencing goals under 18 U.S.C. Sec. 3553
, which mandates a sentence that is "sufficient, but not greater
than necessary" to comply with the purposes of sentencing set forth
in the statute.

In carrying out its post-Booker sentencing duties, the district
court may not presume that the Guideline range is reasonable. Rita
v. United States, 127 S. Ct. 2456, 2465 (2007); Gall v. United States
, 128 S. Ct. 586, 596-97 (2007). The Guidelines are not to be given
any more or less weight than any other factor under Sec. 3553.
Kimbrough v. United States, 128 S. Ct. 558, 570 (2007). In a 2009
decision the Supreme Court emphatically restated this principle
when summarily reversing a defendant's Sentence: "The Guidelines
are not only not mandatory on Sentencing Courts; they are not to be
presumed reasonable." Nelson v. United States, 129 S. Ct. 890, 892
(2009)(per curiam)(emphasis in original).

Extraordinary circumstances are not needed to justify a
sentence outside the guideline range, and appellate courts are
required to give due deference to the district court's decision
that the sentencing factors warrant a particular variance. Gall
v. United States, 552 U.S. 38, 47 (2013). T his standard reflects
the common theme throughout the Supreme Court's recent sentencing
decisions to "breathe life into the authority of district court
Judges to engage in individualized sentencing," United States v.
Whitehead, 532 F.3d 991, 993 (9th Cir. 2008)(per curiam)(internal

page 6 of 36

quotation marks ommitted).

This Court has endorsed a "Sequential determination of the guideline range, including any proposed departures, followed by the further determination whether other factors identified by either side warrant an ultimate sentence above or below the guide-line range." United States v. Jimnez-Beltre, 440 F.3d 514, 518-19 (1st Cir. 2006)(en banc). Thus the Court typically should first calculate the correct guideline range, and then determine whether , after consideration of the Sec. 3553(a) factors, a sententence above, within, or below that range will be sufficient, but not greater than necessary, in light of the sentencing goals. See United States v. Kimbrough, 552 U.S. 85, 110-11(2007)(endoring district court's adoption of this approach). Finally, the Court should articulate in open Court how consideration of these factors led to select  a aprticular sentence, Sec. 3553(c)." United States v. Rodriguez, 2013 U.S. App. LEXIS 19620 (Sept. 25, 2013).

page 7 of 36

## C. NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF PONZO

Ponzo was born in Boston, MA in the summer of 1968 to Michael and Patricia Ponzo, where they resided until Ponzo was four. Then Ponzo and his father, mother and six year old sister. moved to Swampscott, MA. As a child Ponzo was diagnosed as being 50 percent deaf and suffering from ADHD, Ponzo was seen at the Children's Hospital in Boston concerning his 50 percent hearing loss, and given dual hearing aids to alleviate his hearing disability. During Ponzo's elementary school years in Swampscott it was suggested to Ponzo's mother Patricia that Ponzo be medicated with some kind of amphetimine for ADHD. Ponzo's mother refused and removed Ponzo from Swampscott schools and sent Ponzo to the Tower School in Marblehead, MA to great benefit to Ponzo. Regrettably, due to finances after a couple years Ponzo was removed from the Tower School and placed back in Swampscott Public Schools. Ponzo stayed unmedicated in Swampscott schools until as a freshman in High School, due to conflict with his mother patricia, Ponzo was sent to live with Ponzo's father Michael, grandfather Anthony, grandmother Nellie, and great grandmother Franchesca in Boston's North End where violence and drug use was rampant. Ponzo's father was a drug user and seller, illegal bookmaker, Postal Worker, and managed Dom's Restaurant. Ponzo's father was convicted of book-making,despite what the Government alleges otherwise. In those surroundings, with the assistance of his father, Ponzo started using marijuana, alcohol, and cocaine culminating in his first arrest in 1984 for possession of a dangerous weapon (for self defense) that was dismissed.

Ponzo attended the Christopher Columbus High School in the North End for his freshmen and sophmore years, then during his junior and senior years Ponzo attended and graduated from the Peter Fanuiel School/Another Course to College inBeacon Hill, Boston. During High School Ponzo was convicted of possession of a firearm without a FID card, a misdemeanor. Ponzo then decided to Join the United States Army to get out of Boston and the chaos thereof. Ponzo did not make the U.S. Army aware of his significant hearing disability, due to the fact that Ponzo would not have been able to join the U.S. Army with a significant hearing impairment. Ponzo's deafness wasn't a issue during basic training with the constant loud barking of Drill Sargeants, but during AIT Ponzo was disciplined by his instructor for "not listening" (due to not having his dual hearing aids),(See Bates Nos. 61980 &16931-34 Army Records) resulting in Ponzo's discharge. After returning to Boston's North End Ponzo's Grandfather Anthony

Grandfather Anthony, a former boat captain and merchant marine, a positive role model for Ponzo, regrettably passed away. Followed by Ponzo's beloved grandmother Nellie and great grandmother Franchesca. Due to their loss Ponzo became a habitual user of cocaine and eventually became acquanted with CI/CW John Mele, a cocaine dealer, who was engaged to Ponzo's close cousin Maria Domina. In fact, the Uzi and silencer, and other items(i.e. nositol, grinder, firearms) found in the Ponzo family residence in Jan. 1989, belonged to CW mele and the deceased, Robert Paleo, Jr. making that arrest part of the instant offense per USSG§4A1.2 (a)(1), due in part to CW mele and CI Paleo, Jr. then having Ponzo arrested for their belongings, in order to lessen their punishment on their pending charges. CW mele ended up doing five years on a ten year offense from 1989 until 1994. In fact, while CW mele was incarcerated Ponzo had an argument with Frank Salemme, Jr. who stated, "Your cousin Smiley shot my father, he'll get his." During Ponzo's drug use came arrests resulting in an inadequat plea colloquy with no attorney present on Aug. 16, 1989 and was sentenced to the Billerica House of Correction for about a year. While

page 10 of 38

*Note, due to asking for access to the law library to type this, Ponzo was placed in a lockdown and has to finish this motion in writing

page 11 of 34

Ponzo was incarcerated he attended Alcoholics
Anonymous and Narcotics Anonymous
and vowed to never use Cocaine thereafte.
which Ponzo Kept. After Ponzo's release
due to Ponzo's familial relationship with
CW John Mele, Ponzo was a persona non grata
to the top echelon Informant/serial
murderer/cooperating Witness Francis Salemme
Sr. who witnessed CW mele at the pancake
house acting "nervous" prior to Salemme's
Shooting on June 16, 1989 and obviously wanted
to return the favor to CW mele an actual
shooter of TEI/CI/CW Salemme, Sr. (see
Ponzo's discussion with Salemme, Jr. supra).
The evidence at trial showed that CW mele
shot CI/CW Salemme, Sr. because he
extorted mele and CI Augustus LaFace
for a tow truck, a car dealership named
Coastal Auto Sales & $100,000. (see
July 18, 2013 FD-302 page 3 Bates No. 73553).
During the time self proclaimed "Representant
Francis Salemme, Sr. was in charge of his
"NELCN" it was alleged by Cooperating
Witnesses Robert Liusi, Jr & Jerry Matricia,
that TEI/CW Francis Salemme, Sr. and the
deceased serial murderer Richard Devlin
and others murdered Rocco Scali, Vincent

Arcieri, Robert Donati, Anthony Diprizio, Richard Devincent, Michael Romano, Jr. and others. In the early 1990's Ponzo used to visit his friend CI Robert Paleo, Jr. and CW John Mele while they were incarcerated in the Mass. Dept. of Correction. Several cooperating Witnesses Mele, Matricia and Weddleton testified in this trial that Ponzo had an altercation with a close associate of Vincent Ferrara and codefendant Robert Carrozza named Vincent Arcieri resulting in injuries to both of us. This altercation with Ferrara and Carrozza's close associate Arcieri necessitated Ponzo having to visit with Ferrara and codefendant Carrozza in the company of Arcieri to discuss the situation (Trial Exhibit 206 ) to no avail due to Arcieri's close association with Ferrara and Carrozza the situation was never fully resolved. Afterwoods, according to CW Matricia, Mr. Arcieri was murdered by serial killer Richard Devlin. serial killer Devlin was then killed while he was hunting for humans in East Boston allegedly by CW Mark Spisak.

In the spring of 1994 Ponzo started

page 13 of 36

dating Michael Romano, Jr's. wife's
cousin and thereby became good friends.
Regrettably Ponzo and Romano, Jr were arrested
by the BPD for something that had absolutely
nothing to do with Ponzo. necessitating the
dismissal of all charges on March 16, 2014,
On Sept. 1, 1994 when Ponzo's good friend
Michael Romano, Jr. was murdered it was one
of the worst days in Ponzo's life. Later
that night after conflict with Michael
Romano, sr. over his sons murder, Ponzo
had no further association with any of
his codefendants. In Sept. 1994 Ponzo
apprised all of his codefendants that he
wanted no part in the revenge of Michael
Romano, Jr., Ponzo and his good friend
CW Joseph Cirame were allegedly put on
a "hit list" resulting in several attempts
on Ponzo and CW Cirame, resulting in
CW Cirame being shot several times. Under
these circumstances. Ponzo left Boston
and lived with CW Annette Beustwick in
Lowell, MA until March 1995, Then on
March 20, 1995, at the direction of CW
Mele, Ponzo moved to Arizona and was
allegedly minimally involved in the packing
and shipping of marijuana to CW Mele

until the spring of 1997. During this time period Ponzo cohabited with CW Annette Geustwicki, and together they had their first child in Florida during the summer of 1996. The act of having his first child made a profound change in Ponzo looking at life through a whole new perspective.

Ponzo is the only person in this indictment that willingly, knowing and voluntarily, without the intervention of Law Enforcement, withdrew and terminated all association with any criminals. In fact, prior to Ponzo's arrest in Marsing, Idaho on Feb. 7, 2011, other than Ponzo's father Michael, Ponzo did not speak to anybody from New England for over twelve years. Ponzo's father Michael would secretly communicate with Ponzo, and gave his son Enrico ~ $250,000, while Ponzo was on the run for his life, to assist him.

In early 1999 Ponzo and CW Cara Pace left Arizona and eloped to Utah, Washington Oregon and finally settled in Idaho to live the American dream. With money given to Ponzo by his father, and earned by CW Cara Pace, Ponzo built with his own hands, and the assistance of others, a four bedroom 2 bath home with a detached three car

garage for his common law wife cw Cara Pace, and a future home for his children. The Shaw/Ponzo family home was completed in late 2001, their son was born in 2003 and daughter in 2004. Ponzo promptly acclimated himself to the ranching community, his neighbors and friends. Ponzo's new neighbors (Jessie, Lee, Bodie, Gene, Jim, Bob et al!) welcomed him to the community and taught Ponzo how to ranch and raise cows and eventually Ponzo raised his own Black Angus cow herd. In this high, desert ranching community, and much of the western United States, water is life. Ponzo volunteered and was elected, year after year, as the Lateral Manager/Board of Director/Secretary-Treasurer of Whispering Heights Water users Association, inc. from 2003 until his arrest. Ponzo was trusted with all of his neighbors Irrigation Assessments of up to $10,000 annually with never a penny misspent. (See Neighbor Marilyn Diaz letter). Ponzo's greatest joy was being a stay-at-home Dad for his two children in Idaho: from bottle feeding them as babies, their little hands holding my fingers, teaching them to read and write, taking them fishing

and camping, taking them to ZOOBOISE and the discovery Center of Idaho, instilling in them the importance of education and going to college, getting them ready for school, feeding them their meals, doing their homework with them, and most of all seeing their innocent, smiling, and loving faces every day. At Ponzo's Idaho Detention hearing numerous neighbors and friends, that Ponzo made over the decade that he lived in Idaho, showed up in support of him. In fact, Ponzo's neighbor mrs. Jessie Jackson, a former Correctional Officer, testified at the detention hearing to Ponzo's character and relationship with his children as follows, "He was a good dad, took care of his Kids. I used to refer to him as Mr. Mom... Jay (Ponzo), he was the most reliable person I ever met... I could always trust his word." All of Ponzo's law abiding, honest, hard working, Idaho neighbors and friends that were either maliciously subpoened to court in Boston or interrogated by the FBI (Taylor Osborn, Jackson, Holiday, Richards, the Briggs, the Clapiers, Verceles) all expressed the same sentiments concerning Ponzo, that he was an excellent, loving stay-at-home Dad, law abiding community member, and volunteer lateral Manager/Board of Director/Secretary-

Treasurer of W.H.W.U.A., inc., that was always willing to give his assistance to anyone in need. Ponzo's simple life in Idaho was idyllic, then came America's <u>nightmare</u>. Ponzo discovered his common law wife, CW Cara Pace was clandestinely engaging in Cybersex/virtual affair for over two years while Ponzo was caring for their children 24/7/365. While Pace claims she was "abused" during their twelve year relationship, after discovering CW Pace's sexually deviant behavior Ponzo <u>once again</u> paid for and obtained psychiatric care/family counseling for CW Pace with no results. CW Cara Pace, who constantly threatened to contact the authorities, knowing full well Ponzo was a felon/fugitive took their children 500 miles away from their Daddy, Ponzo, to Utah. Ponzo's children did not take well to leaving their primary caregiver Ponzo, especially his, then, seven year old son, who was constantly in trouble in school eventually having the police called on him. Ponzo, knowing full well the risks from CW Pace, filed for full custody of his children, knowing full well it could cost him his life.

Shortly after Ponzo filed for full custody,
CW Pace carried through with her threats,
Ponzo was arrested for this indictment by
U.S. Marshalls. Apparently, in the final PSR
CW Pace made some outrageous statements
that Ponzo strongly objects to; Ponzo
absolutely never choked, hit, or sexually assault
any women in his life, Ponzo did go food
shopping for the family weekly, and did
live in seperate bedrooms for a while, after
CW Pace pulled a firearm on Ponzo, during a
disagreement. CW Pace is a very angry,
violent person (a former skinhead) who
physically abuses our children. The
report that CW Pace called the Utah Dept.
of Children and Family Services after she
hit her own child defies logic. Ponzo was
researching all the options beside surgery,
i.e. patch, eye drops, instead of surgery, before
his arrest, for his daughter's lazy eye.
    At this point, Ponzo has been incarcerated
for over three years, and due to the fact
CW Pace refuses to accept Ponzo's calls
or forward mail to his children, Ponzo has
not spoken to his beloved children in over
18 months and despite numerous birthday cards
and letters there has been no responses, During
Ponzo's new life in the western U.S. Ponzo

suffered great losses, his mother died in 1997 and his father died in 2007, and due to Ponzo's situation he could not attend their services. After Ponzo's arrest in 2011 when he returned to Mass. he resumed his relationship with several law abiding friends and family members, who were all maliciously grilled by the FBI and/or subpoened to Grand Juries. Due to constant harassment by the FBI, Ponzo's best friend in Idaho who was residing in Ponzo's family home in Idaho during his detainment committed suicide. Ponzo can honestly say that the birth of his children and his mother's diagnosis with Lou Gehrig's disease that led to her death six months later on Dec. 8, 1997 led to a profound change in Ponzo's thinking and withdrawal and termination of any criminal activities at age 29.

Ponzo despite many adversities throughout his life, a hearing disability and ADHD, voluntarily and willingly Rehabilitated himself and led a wholesome, honest, drug-free, hard working, selfless life in Idaho from 2000 through 2011 as a stay-at-home Dad, Cattle Rancher and elected community volunteer. a thirty plus year prison sentence as recommended by the PSR

will deprive his Idaho neighbors of someone they all would welcome back in their community and homes with open arms, (see Attached Neighbor Letters). Ponzo's main concern is the well being of his three children, and if able will continue to stress the importance of education and college guiding them to their goals of college degrees thereby becoming engineers and a doctor. Due to provisions Ponzo made with his father, his oldest son is enrolled in college as well as all three of his nieces and nephew (who graduated from Boston University), Ponzo's sister, Alexandria, has her masters in teaching from Boston College. When Ponzo is released he intends to rejoin his children out west, preferably Idaho at the family home he built for them with money given to Ponzo from his father and CW Caraface's employment income.

Ponzo has not been accused of violence since those acts alleged in 1994, 20 years ago. There is scientific evidence from the National Institutes Report that human brain development may not become complete until age 25, or thereabouts, see Gall, 552 U.S. 38, 58 (2007). Virtually identical nature and circumstances to Ponzo's were discussed

in the 2007 supreme Court decision granting
a substantial downward variance due to
voluntary withdrawal, immaturity as a young
adult under 25, addiction to drugs and
alcohol, & unlikely future criminal conduct, si
Gall, 552 U.S. 38, 57-59 (2007), "Given the
dramatic contrast between Gall's behavior
before he joined the conspiracy and his conduct
after withdrawing, it was not unreasonable
for the District Judge to view Gall's
immaturity at the time of the offense
as a mitigating factor, and his later behavior
as a sign that he had matured and would not
engage in such impetuous and ill-considered
conduct in the future. Indeed, his consideration
of that factor finds support in our cases, ...
a jury was free to consider a 19-year-old
defendant's youth when determining whether
there was a probability that he would continue
to commit violent acts in the future ...
The District Court quite reasonably attached
great weight to Gall's self motivated rehabilitation
which was undertaken not at the direction of,
or under supervision by, any court, but on
his own initiative. This also lends strong support
to the conclusion that imprisonment was
not necessary to deter Gall from engaging
in future criminal conduct or to protect the public

from his future criminal acts. See 18 U.S.C,
§§ 3553(a)(2)(B),(C)." (cites ommitted).

Ponzo, like Mr. Gall, forged a new "law-
abiding", "illegal drug free", "self-rehabilitated"
life, after the folly of youth. While Gall
was arrested a mere "3½ years after Gall
withdrew from the conspiracy" Ponzo was
arrested 14 years after he voluntarily
withdrew from his alleged minor role in the
shipping of marijuana in Arizona, in fact
CW Rudolph testified that he shipped Marijuana
to legal medical dispensaries in San Francisco
(to aid terminally ill patients with AIDS and
other maladies) and he felt it was a good
thing (see Rudolph trial Day 19-211). Ponzo
has in fact not used an illegal drug in
over 17 years. Ponzo has not been convicted
of acts of violence since those alleged in
this indictment 20 years ago, as described
supra in Gall as the human brain is immature
and impetuous until the age of 25, which
was Ponzo's age 20 years ago. The Supreme
Court gave great weight to the fact that
Mr. Gall voluntarily withdrew from the drug
conspiracy and self-rehabilitated on "his
own initiative" years prior to his arrest and
not due to "the direction of, or under supervisio
by, any court," and sentenced Gall to probation

for 36 months." In fact, AUSA CHao, during closing arguments stated that Ponzo had the "control" to stop all criminal activity involving the shipping of marijuang, despite allegedly large profits, over a decade prior to Ponzo's arrest. The overwhelming evidence from all of Ponzo's Idaho neighbors, for over ten years, is that Ponzo was an inordinately helpful, law abiding, selfless community member and could not believe that Ponzo (Jay) could be responsible for these sordid crimes and all state that Ponzo is welcome back in Idaho. I can honestly aver that my outlook on life has changed since having children of my own. I always taught my children the Golden Rule, "Do to others whatever you would have them do to you," Matthew 7:12. Unlike Gall, who received probation, Ponzo understands that due to his exceptional, voluntary self Rehabilitation under the provisions of § 3553(a) a sentence of 15 years, or under, is a more appropiate in this matter with a substantial term of supervised release of five years to prove to the Court that Ponzo has forged a new life for himself.

D. KINDS OF SENTENCES AVAILABLE AND THE ADVISORY

## SENTENCING GUIDELINES

18 U.S.C. §3553(4)(A)(i) states the advisory sentencing guideline range is: "subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the sentencing Commission into amendments issued under section 994(p) of title 28). There are two extremely pertinent pending amendments to the advisory sentencing guidelines and the statutory mandatory minimums that should be applicable in this matter forthwith: the July 31, 2013 Smarter Sentencing Act of 2013, S.1410 (SSA of 2013) which will change 21 U.S.C. §841(b)(1)(A) from a ten year mandatory minimum with a corresponding Guideline offense level of 32 to a five year mandatory minimum with a corresponding Guideline offense level of 26, and 841(b)(1) (B) will change from a five year mandatory minimum with a corresponding Guideline offense level of 26 to a two year mandatory minimum with a corresponding Guideline Offense level of 18; The Jan. 17, 2014 proposed Amendments to the Sentencing Guidelines that were unanimously enacted

On April 10, 2014 will change the corresponding
Guideline offense level from 32 to 30
for §841(b)(1)(A), and the corresponding
Guideline offense level from 18 to 16
for §841(b)(1)(B). Ponzo was convicted
of both §841(b)(1)(A) & (B) therefore
with the enactment of the SSA of 2013
he should be sentenced to five years
minimum mandatory with an offense
level of 24, or in the alternative
with the enactment of the P.A.S.G. of 2013
(see Exhibit #2) on April 10, 2014 841(b)(1)(A)
will be an Offense Level of 30. In Docket
No. 2001 Ponzo filed a Motion to stay
the sentencing hearing until those changes
are enacted, it was denied therefore
Ponzo objects if these amendments
are not taken into consideration of
Ponzo's future sentence, This court
may sentence Ponzo irrespective of the
Advisory Sentencing Guidelines to the
five year statutory mandatory
minimum in 21 U.S.C. 841(b)(1)(A) & (B)
and the mandatory five year consecutiv
sentence mandated by 18 U.S.C. 924(c)
for Count 3, on Count 2, 18 U.S.C. 1959
(a)(5) based on the Jury's verdict.
(See Alleyne supra III A)

"Our post-Booker decisions make clear that a district court may in appropiate cases impose a non-Guidelines' sentence based on a disagreement with the Commission's views ...., That is particularly true where, as here, the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted," Pepper, 31 S. Ct. at 1247 (2011).

Ponzo hereby objects to the PSR not using "certified copy of a conviction", of Ponzo's alleged prior convictions therefore they should be excluded from the PSR and not used for Ponzo's sentencing. See United States v. Bryan 571 F.3d 147, 153-57 (2009).

Allthough Ponzo strongly maintains his innocence on most of the charges, on Nov. 20, 2013 after a seven week trial the Jury convicted Ponzo of twelve charges/counts, Ponzo has thoroughly discussed the twelve counts of conviction in the enclosed Objections to PSR (Exhibit No. 1) and those objections are incorporated by reference as if fully set herein as part of this sentencing memorandum, as well as all other previous submissions to Probation, but Ponzo ha

a few more additions. As noted supra in,
(III A) Peugh there is an ex post facto
violation in using guidelines enacted post
commission of an criminal offense
that increases the Guideline range
applicable to Ponzo, but if the guideline
amendments enacted post offense
mitigate the guideline range they
may apply in Sentencing Ponzo. Ponzo was
recently apprised that the Proposed
Amendments to the Sentencing Guidelines
were unanimously approved on April 10, 2013
by the U.S. Sentencing Commission, (see
Exhibit No. 2 April 11, 2014 USA TODAY ARTICLE)
therefore they should apply now to Ponzo's
Sentencing with an offense level of
30 for §841(b)(1)(A)'s current ten year
mandatory minimum and offense level
24 for the new 5 year mandatory
minimum per the SSA of 2013. The
relevant §841(B)(1)(A) & (B) counts that
use USSG §2D1.1 are 1s, 6s, 14s, 15s, 16s &
17s that are located in Count Group 3,
paras. 108-117 of the PSR. The Jury Convicted
Ponzo of 1000 kgs of marijuana (Ct. 14s(11))
and 500 grams of Cocaine (Ct. 6s(4)), therefore
1000-3000 kgs are attributable to Ponzo

page 28 of 36

with a base offense level of 24 for
USSG §2D1.1(c)(7) if the SSA of 2013
is rightfully taken into account or
30 otherwise for the new applicable
USSG §2D1.1(c)(5). Ponzo objects to
the application of any Post 1999-2001
Sentencing Guidelines that aggravate
the punishment for this Count Group
3, (USSG §2D1.1(b)(14)(E) was enacted in
2011) as facts not found by the
Jury and ex post facto violations,
see Peugh and Alleyne supra at III(A).
Otherwise, Ponzo specifically objects
to the application of USSG §3B1.1, he was
definitely not an "organizer, leader,
manager, or supervisor" of anyone
nevermind "five or more participants",
see United States v. Ramos-Paulino,
488 F.3d 459, 464 (1st Cir. 2007) (3B1.1C not
applicable as a contact, for smuggling
aliens, that is responsible for determining
fees and accepting payments, procuring
false documents & scheduling of transports
"For present purposes, then, we are constraine
by the unambiguous caselaw holding that

management of criminal activities, standing alone, does not constitute a basis for a role-in-the offense enhancement under USSG § 3B1.1." (emphasis added). In fact, CW David Rudolph testified that he "cut out" Ponzo of the shipping of marijuana (see PSR ¶71, and CW Rudolph was later arrested for his conduct in Arizona with a substantially larger CW Weddleton operation involving a dozen people involved in the packing and shipping of marijuana that was evidently first discovered on Sept. 1, 1998 (see Bates No. 62017 Arizona Charge) over a year after Ponzo's withdrawal from his alleged minor role in the packing and shipping of marijuana at the behest of CW John Miele. In the alternative, if the Court decides this enhancement does apply then, at most, there were only three other actual participants and § 3B1.1 (c) should apply with its 2 points. In fact Ponzo asserts that due to his minor role, USSG § 3B1.2 (b) applies to all of the charges with a -2 point

page 30 of 36

reduction, See United States v. Munoz,
36 F.3d 1229, 1238 (1st Cir. 1994) (where
USSG §3B1.2 (b) minor role participant
applicable for defendant involved in at
least 4 cocaine transactions, and performed
a number of different functions, including
guarding the drugs, conducting counter-
surveillance, and delivering cocaine base)
In addition, pursuant to Peugh, supra III (A),
the applicable guidelines manual
for this group is the 2001 F.S.G.M.
    In regards to PSR, ¶¶ 94-107, Groups
one and two, there was no evidence
of an attempt to commit First Degree
Murder. When CW Mele shot TEI/CW
Frank Salemme, Sr., he did not attempt to
get out of the vehicle and finish him off
as Serial Murderer Frank Salemme told
investigators on July 18, 2013, (FD 302
page 3 Bates No. 73553). As explained previously
whomever shot Cirame, did not try to kill
him having shot my good friend CW Cirame
several times in the lower extremities, And
neither of the shooting victims suffered
permanent or life threatening injuries so only

2 points apply for serious bodily injury would apply pursuant to USSG 2A2.1. As objected to previously Ponzo strongly objects to using post offense guideline ranges for these Count Groups 1&2 as a ex post facto violation as explained in Peugh supra III(A).

Ponzo also maintains that he is not a career offender, due in part to probation insisting on using the 2013 F.S.G.M that violates the ex post facto clause of the U.S. Constitution per Peugh supra, for the addition of poss. of a silencer and the § 4B1.1(c) provisions enacted in 2002 and 2004 Amendments 546, 642 & 647 for crimes completed in 1999. Most of the charges, except for two Cts. 13s and 16s, that had absolutely no relation to any other counts, were completed prior to 2001. Using the 2013 F.S.G.M for offenses that normally would be inapplicable due to statute of limitations issues that are tolled while a defendant is a fugitive 18 U.S.C § 3290, has created a clear ex post facto violation in this case

page 32 of 36

In addition, since all of Ponzo's alleged convictions occured subsequent to this offense, that allegedly started in 1989 (i.e. Cts. 1,2,3 & 6), and therefore they are inapplicable to any Career Offender designation, see USSG § 4B1.2(c)," the defendant committed the instant offense subsequent to sustaining at least two felony convictions", also See previous April 7, 2014 letter to Probation.

as previously stated in, Objections to PSR, Ponzo strongly feels that Downward Departures do apply in this matter for Post-offense Rehabilitation, Pre-indictment delay, USSG §§ 5K2.0, 5K2.10 (Victim's Conduct § 5K2.11 (Lesser Harms); and § 5K2.12 (Coercion and Duress) that Ponzo will put forth at the sentencing hearing and possibly a seperate motion relative to Down Ward Departures & Policy Statements E.  Per § 3553 (a)(6) a sentence disparity will occur if the court sentences Ponzo on these charges in excess of 15 years due to his ancient criminal History will substantially increase the punishment from defendants who were not on the run for their life and subject to 18 U.S.C. § 3290

page 33 of 36.

In addition, it also subjected Ponzo to
a disparitive sentence from other
defendants due to the pre-indictment
delay of up to 23 years on some
of the counts, and a defendant not
on the run for his life would definitely
be subject to a five year statute
of Limitations per 18 U.S.C. § 3282
like all of the cooperating witnesses
in the marijuana conspiracy charge
in Count 14s(11) (Crussto ico, Weddleton, Rudolph,
Martocchio, Guintiero, Piano, etc.). In fact, Ponzo
asked Atty. Cunha to file a F.R.Cr.P. 48(b)
(1) motion to dismiss the ~~int~~ superseding
Indictment for <u>unnecessary delay</u> in
presenting a charge to a grand jury and (2)
filing an information (indictment). In fact
in Court, on Nov. 1, 2013, Judge Gorton
ordered the government to supersede Ponzo
within five weeks when in fact they
superseded Ponzo 13 weeks later on
Jan. 31, 2013. Atty. Cunha refused due to his
ineffective assistance in not filing said motion.

# IV. CONCLUSION

WHEREFORE, for all the foregoing reasons, and previous submissions to Probation and the Court, Ponzo respectfully requests that the Court sentence Ponzo to, a more than adequate, 15 years or less sentence, with 5 years of supervised Release to prove Ponzo has forged a new life to the Court, this sentence would be akin to similarly situated defendants who were not on the run for their life due to serious threats and attempts. Respectfully submitted

Enrico Ponzo 4/18/14
Enrico Ponzo, pro se

## CERTIFICATE OF SERVICE

I, Enrico Ponzo, prose, hereby certify that a true copy of the above document was served upon AUSA Michael Tabak, U.S. Attorneys Office and S.P.O Jennifer Broguist by Email and/or U.S. Mail/ Postage Prepaid on the 18th day of April, 2014.

Date placed in the mailbox/Unit Managers Hand: 4/18/14

Enrico Ponzo
Enrico Ponzo, Defendant ProSe